2020 IL App (1st) 192619

Fourth Division
December 3, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| WENDY HARTLEY, as Special Administrator of the Estate of Kevin Hartley, Deceased, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal from the Circuit Court of Cook County. |
| NORTH AMERICAN POLYMER COMPANY, LTD., an Illinois Corporation, and SAMAX ENTERPRISES, INC., a New York Corporation, | ) ) ) ) | No. 18 L 004262

The Honorable Melissa A. Durkin, |
| Defendants and Third-Party Plaintiffs-Appellants | ) ) | Judge Presiding. |
| (Tony Hartley, Individually and d/b/a Hartley's Painting, Third-Party Defendant-Appellee). | ) ) ) ) ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Wendy Hartley filed a wrongful death lawsuit based on products liability and negligence after her son, Kevin Hartley, died from inhaling fumes from a product manufactured by defendant Samax Enterprises, Inc. (Samax) and sold by defendant North American Product Company, Ltd. (NAPCO). Defendants, in turn, filed third-party complaints for contribution against Tony Hartley and his business, Hartley's Painting (collectively,

Hartley), decedent's uncle and the owner of the business where decedent was working at the time of his death. Plaintiff and Hartley entered into a settlement agreement, settling any claims between plaintiff and Hartley for $50,000, and sought a finding that the settlement was made in good faith. The trial court initially declined to enter a good faith finding but, after granting a motion to reconsider, entered an order finding that the settlement between plaintiff and Hartley was made in good faith. Defendants appeal[1] and, for the reasons that follow, we reverse.

¶ 2                                    BACKGROUND

¶ 3         On April 26, 2018, plaintiff was appointed as special administrator of decedent's estate and, on the same day, filed a complaint against defendant NAPCO; defendant Samax was added as a defendant on June 29, 2018, when plaintiff filed an amended complaint. The amended complaint alleged that Samax manufactured, and NAPCO sold, a product called "NAPCO White Lightning Low Odor Stripper," which was used in bathtub refinishing and which contained a volatile chemical known as methylene chloride. Decedent, who performed rehabilitation and construction work, was 21 years old and used the product on April 27, 2017, while refinishing a bathtub at an apartment complex in Nashville, Tennessee. Decedent was wearing a respirator mask and gloves, but was overcome by fumes from the product and was rendered unconscious; he died the next day.

¶ 4         The complaint set forth two causes of action against each defendant: one for strict products liability and one for negligence. Both alleged that the product was unreasonably dangerous and

---

[1] Defendants NAPCO and Samax initially filed separate appeals, which were consolidated on January 21, 2020. NAPCO and Samax have adopted each other's briefs on appeal, while plaintiff has adopted Hartley's brief and did not file one of her own.

toxic, and that defendants did not adequately warn users about the danger and did not adequately test the product to ensure that it was safe for its reasonable anticipated use.

¶ 5        On July 24, 2018, NAPCO filed a third-party complaint for contribution against Hartley, alleging that, at the time of decedent's death, he was employed by Hartley. NAPCO alleged that Hartley was negligent in failing to properly train or supervise decedent with respect to working with products containing methylene chloride and failed to provide decedent with proper protection equipment. NAPCO alleged that, to the extent that any judgment was entered against NAPCO in plaintiff's litigation, it was entitled to contribution from Hartley for any damages in excess of NAPCO's *pro rata* share of liability.

¶ 6        On December 11, 2018, plaintiff filed a motion for a good faith finding, claiming that Hartley, through his insurance carrier, had offered $50,000 to settle directly with plaintiff in order to extinguish any potential liability. Plaintiff accepted the settlement offer and requested a finding that the settlement was made in good faith as a result of arm's-length settlement negotiations. Plaintiff claimed that the settlement was reached after an arm's-length negotiation between plaintiff's counsel and counsel hired by Hartley's insurance carrier and was for a substantial sum of money. Additionally, plaintiff claimed that Hartley had "numerous defenses to [NAPCO's] claims against him, including jurisdictional defenses, choice of law defenses and liability defenses."[2]

¶ 7        On January 4, 2019, Hartley filed a motion to dismiss the third-party complaint pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2018)), based on the settlement or, alternatively, based on Tennessee law. Hartley claimed that the settlement

_____

[2] At the time of the motion, Hartley had not yet filed any responsive pleadings to the third-party complaint.

with plaintiff was made in good faith and that there was no evidence of any fraud or collusion. Hartley also claimed that he had an insurance policy with Ohio Security Insurance Company, which "has taken the position that the Third Party Complaint is not covered under Tony Hartley's CGL policy because it contains (as is typical), an employer's liability exclusion." Therefore, if Hartley was found to be the employer of decedent, as alleged in the third-party complaint, Hartley's insurance policy would not apply and Hartley would not be able to pay any judgment that was entered against him, meaning that "NAPCO has a real possibility of recovering $0 on its third party claim against" him.

¶ 8        In the alternative, Hartley claimed that the third-party claim should be governed by Tennessee law, as the alleged negligence occurred in Tennessee. In that case, Hartley claimed that the third-party complaint should be dismissed because there was no third-party contribution available under Tennessee law under the circumstances set forth in the complaint.

¶ 9        On January 14, 2019, Samax filed a motion for leave to file a third-party complaint against Hartley, which was granted on January 17, 2019. Samax's third-party complaint was similar to NAPCO's, in that it alleged that decedent was employed by Hartley at the time of his death and Hartley was negligent in failing to train and supervise decedent with respect to the use of products containing methylene chloride and failed to provide the proper safety equipment to decedent.

¶ 10        On January 17, 2019, defendants filed a joint motion for limited discovery, claiming that they needed discovery concerning the settlement, given that Hartley was decedent's uncle and was "attempting to settle with Plaintiff for peanuts compared to his potential exposure." Defendants claimed that the discovery propounded so far showed that Hartley had settled with the Tennessee Occupational Safety and Health Administration (TOSHA) for 13 violations of

regulations in connection with decedent's death, 12 of which were marked as " '[s]erious.' " Additionally, defendants pointed to the familial relationship between plaintiff and Hartley, and noted that plaintiff had not sued Hartley directly. Defendants claimed that "[t]he parties and the court need to ascertain the relationship between the parties, the extent to which that familial relationship impacted any settlement negotiations, the limits of any applicable insurance policies, and the conduct of the parties." Accordingly, defendants sought limited discovery in the form of interrogatories, requests for production, and the depositions of plaintiff and Hartley.

¶ 11    On the same day, the trial court entered an order granting defendants "leave to issue written discovery limited to insurance held by Tony Hartley and communications among the parties relating to settlement." Defendants issued written discovery to Hartley and three insurance companies. On February 27, 2019, Hartley filed a motion to quash, claiming that he had responded to any appropriate discovery requests and that defendants' remaining requests, as well as their subpoenas to the insurers, were overly broad and irrelevant to the issue of the good-faith finding.

¶ 12    Attached to Hartley's motion to quash were copies of his discovery responses. In his answers to interrogatories, Hartley indicated that the only discussions concerning settlement occurred between plaintiff's attorney and Hartley's attorney, and Hartley did not have any communications with plaintiff himself. Hartley also indicated that he had an insurance policy with Ohio Security Insurance Company that had a limit of $1 million for each occurrence. However, Hartley "is aware that Ohio Security Insurance Company has taken the position that the Third Party Complaint is not covered under Tony Hartley's CGL policy because it contains an employer's liability exclusion." Hartley's response to defendants' requests to produce

5

indicated that he produced e-mails between the attorneys regarding settlement and a copy of his insurance policy.

¶ 13     On March 19, 2019, defendants filed a joint motion for additional discovery, which requested the depositions of plaintiff and Hartley, and an *in camera* inspection of documents responsive to the subpoenas issued to the insurance companies. On March 20, 2019, Hartley filed a response to the motion, objecting to any additional discovery. Hartley claimed that defendants had "an abundance of discovery in their possession," totaling over 800 pages.

¶ 14     On March 21, 2019, the trial court entered an order granting Hartley's motion to quash and denying defendants' motion for additional discovery.

¶ 15     On March 21, 2019, NAPCO filed a motion for leave to file an amended third-party complaint. NAPCO noted that the original third-party complaint alleged that decedent was an employee of Hartley's business, but claimed that documents produced through the discovery process led NAPCO to believe that decedent was an independent contractor, not an employee, including evidence that decedent purchased his own respirator and paid for his own training, that Hartley did not have worker's compensation coverage for decedent, and that decedent had been issued an IRS Form 1099 for his work. Accordingly, NAPCO sought to amend the third-party complaint to identify decedent as "an independent contractor, employee, or agent" of Hartley. On March 26, 2019, Samax filed a similar motion, seeking to amend its third-party complaint. The motions were granted, and both defendants filed amended third-party complaints on April 3, 2019.

¶ 16     On April 11, 2019, NAPCO filed its response to plaintiff's motion for a good-faith finding and Hartley's motion to dismiss pursuant to settlement. NAPCO argued that the settlement between plaintiff and Hartley was not made in good faith because (1) there was a close personal

6

relationship between plaintiff and Hartley; (2) Hartley's $50,000 settlement on a $1 million insurance policy was "grossly disproportionate" to Hartley's fair share of liability, especially given the TOSHA violations; (3) plaintiff never sued Hartley directly; and (4) Hartley attempted to rely on the "employee" exclusion of his policy to justify the settlement figure throughout the litigation, but only recently disclosed that decedent might be an independent contractor, not an employee. Samax filed a similar response on the same day.

¶ 17 On June 26, 2019, the trial court entered an order denying the request for a good-faith finding. The court first found that plaintiff and Hartley had satisfied their initial burden of proof by showing a valid settlement agreement. The court then proceeded to consider the totality of the facts, including consideration of four factors, in determining whether the settlement was made in good faith. The court first discussed the reasonableness of the amount paid compared to the settlor's fair share of liability, and found that Hartley's fair share of liability was "potentially significant," especially given that TOSHA issued a report that was critical of the respirator that decedent was wearing and of Hartley for supplying it. The court found that the $50,000 settlement represented 5% of the available liability coverage under Hartley's insurance policy. The court noted that the policy contained an exclusion for employees, but found that "it is not clear that the exclusion would apply in this case," as records showed that decedent was paid as an independent contractor and received an IRS Form 1099 and no worker's compensation claim was filed. Thus, the court found that defendants "have shown that the settlement amount is not reasonable compared to Tony Hartley's fair share of liability."

¶ 18 The court next considered the relationship between the settling parties. The court found that the parties were related by marriage and that, even though plaintiff's marriage with Hartley's brother had been dissolved 15 years ago, takers in the wrongful death action included

plaintiff's former husband, another son, and a daughter. The court further found that plaintiff's former husband and remaining son both also worked for Hartley and were, in fact, present when decedent's death occurred. The court also noted that plaintiff and Hartley had "known each other for years." Accordingly, the court found that "[t]heir agreement to settle this wrongful death case for only $50,000 has the appearance of collusion."

¶ 19     The court then considered whether the plaintiff sued the settlor, and found that plaintiff had not sued Hartley. While the court acknowledged that the complaint was based on strict liability due to the known dangers of methylene chloride, the court found that plaintiff "chose not to sue her former brother-in-law for negligence even though Tony Hartley supplied an inferior respirator for [decedent's] use." The court found that this "also bears the appearance of collusion."

¶ 20     Finally, the court considered whether there were efforts to conceal the circumstances surrounding the settlement. The court noted that defendants claimed that plaintiff and Hartley attempted to conceal decedent's status as an independent contractor, but found that "the circumstances surrounding settlement do not appear to be in dispute," and the parties were able to conduct discovery regarding the settlement. Accordingly, the court found that this factor was "neutral" in its analysis.

¶ 21     Ultimately, the court found:

> "In considering the totality of the circumstances, the court does not find that the proposed settlement of all claims against Tony Hartley d/b/a Hartley's Painting were settled in good faith. The settlement amount represents a small portion of Tony Hartley's potential liability, and the familial relationship between the setting parties has the appearance of collusion."

8

Accordingly, the court denied the motions for a good-faith finding.

¶ 22    On July 26, 2019, Hartley filed a motion for reconsideration of the trial court's June 26, 2019, order. Hartley claimed that the court made several mistakes of fact in its analysis. First, Hartley claimed that there was no evidence that he had supplied decedent with the respirator he was wearing at the time of his death and the only evidence was that decedent had purchased his own respirator. Additionally, Hartley claimed that there was no evidence that decedent's father and brother were present when the incident occurred; instead, the only evidence was that "they were elsewhere."[3] Hartley also claimed that the court had made a mistake of law in not applying a preponderance of the evidence standard to overcome the presumption of good faith. Hartley claimed that there was no evidence that Hartley had supplied the respirator, no evidence that family members were present, and no evidence of any collusion, so defendants could not show by a preponderance of the evidence that the settlement was not made in good faith.

¶ 23    On November 26, 2019, the trial court entered an order granting Hartley's motion for reconsideration. The court found that it had made an error of fact when it found that Hartley had supplied the respirator decedent was using. The court found that "[t]he error of fact is critical, because it wrongly attributes fault to Tony Hartley. As a result, the court did not properly assess potential liability." Additionally, the court found:

---

[3] It is not clear what relationship decedent's brother has with Hartley or his business. In Hartley's motion for reconsideration, Hartley claimed that "the only indications in the Tennessee OSHA report are that [decedent's father and brother] were elsewhere in the Nashboro Village apartment complex, working on their own refinishing projects (as decedent was), and ultimately found the decedent when he had not been heard from for some time." However, in his reply in support for his motion to reconsider, Hartley claimed that "decedent's brother (Plaintiff's son) who was present when decedent was found *after the incident had occurred* has never had any business relation whatsoever with [Hartley]." (Emphasis in original.) Thus, it appears that Hartley's position is that the brother is involved in the same type of work and was working on the same project, but was doing so independently of Hartley's work.

"The court further erred in inferring the appearance of collusion between the settling parties where there was no affirmative evidence of collusion in the record. Extensive discovery was taken to probe communications between various members of the Hartley family. Nevertheless, the evidence in this case points to an arm's length settlement negotiated by counsel. There is no direct evidence that Tony Hartley or [plaintiff] were involved in negotiating the proposed settlement. The court drew an inference from a familial relationship; the inference was not drawn from testimonial or documentary evidence."

The court found that it had "erred in two ways. The court overstated Tony Hartley's potential liability, and the court read too much into the relationship between the settling parties." Consequently, the court granted Hartley's motion for reconsideration and made a good-faith finding. The court also found that, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), there was no just reason to delay appeal. Both defendants filed timely notices of appeal, and these appeals follow.

¶ 24                                             ANALYSIS

¶ 25        On appeal, defendants claim that the trial court erred in granting Hartley's motion for reconsideration and making a good-faith finding. Under the Joint Tortfeasor Contribution Act (Contribution Act), where two or more persons are subject to tort liability arising out of the same wrongful death, there is a right to contribution among them. 740 ILCS 100/2(a) (West 2018). However, where a release is given in good faith by the claimant to one of the joint tortfeasors, that tortfeasor is discharged from all liability for contribution, and the recovery against the remaining tortfeasors is reduced by the amount of the settlement. 740 ILCS 100/2(c), (d) (West 2018). Our supreme court has recognized that the Contribution Act seeks

to promote two important public policies: the encouragement of settlements and the equitable apportionment of damages among tortfeasors. *Antonicelli v. Rodriguez*, 2018 IL 121843, ¶ 13; *Johnson v. United Airlines*, 203 Ill. 2d 121, 133 (2003).

¶ 26    "The 'good faith' of a settlement is the only limitation which the [Contribution] Act places on the right to settle and it is the good-faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor." *Johnson*, 203 Ill. 2d at 128; *Antonicelli*, 2018 IL 121843, ¶ 14. When a court is asked to determine whether a settlement was negotiated in good faith within the meaning of the Contribution Act, the settling parties carry the initial burden of making a preliminary showing of good faith by a preponderance of the evidence. *Johnson*, 203 Ill. 2d at 132.  The objecting party then has the burden of proving the absence of good faith by a preponderance of the evidence. *Johnson*, 203 Ill. 2d at 132. "At a minimum," the settling parties must show the existence of a legally valid settlement agreement, although other factual evidence may be necessary before the court may make its initial determination. *Johnson*, 203 Ill. 2d at 132. As noted, once the settling parties have made a preliminary showing of good faith, the party challenging the good faith of the settlement has the burden to prove the absence of good faith by a preponderance of the evidence. *Johnson*, 203 Ill. 2d at 132.

¶ 27    The Contribution Act does not define the term "good faith," and there is no single, precise formula for determining what constitutes "good faith" that would be applicable in every case. *Johnson*, 203 Ill. 2d at 134. Our supreme court has made clear that "[a] settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud." *Johnson*, 203 Ill. 2d at 134. Additionally, a settlement will not satisfy the good-faith requirement if it conflicts with the terms of the Contribution Act or is inconsistent

11

with the policies underlying the Contribution Act. *Johnson*, 203 Ill. 2d at 134. While no factor is determinative, other considerations may also include "whether the settlement amount was reasonable and fair, whether the parties had a close personal relationship, whether the plaintiff sued the settling party, or whether information about the settlement agreement was concealed." *Palacios v. Mlot*, 2013 IL App (1st) 121416, ¶ 22 (citing *Wreglesworth v. Arctco, Inc.*, 317 Ill. App. 3d 628, 633 (2000)); see also *Ross v. Illinois Central R.R. Co.*, 2019 IL App (1st) 181579, ¶ 26 (discussing same factors).

¶ 28    In the case at bar, the trial court considered these four factors, both in its original order denying the motion for a good-faith finding and in its order granting the motion to reconsider. In its original order, the court found that (1) as to the first factor, the settlement amount was not reasonable compared to Hartley's fair share of liability; (2) as to the second factor, the relationship of the parties and the amount of the settlement had the appearance of collusion; (3) as to the third factor, the fact that plaintiff chose not to sue Hartley "even though Tony Hartley supplied an inferior respirator for [decedent's] use" further supported an appearance of collusion; and (4) as to the fourth factor, there was no evidence that plaintiff and Hartley had attempted to conceal the circumstances surrounding the settlement, so that factor was "neutral." Thus, in considering the four factors, the court found that three of the factors weighed against a good-faith finding, while one was neutral. Later, in granting the motion to reconsider, the court addressed the first two factors again, finding (1) as to the first factor, the fact that decedent provided his own respirator diminished Hartley's potential liability, but the factor still weighed against a good-faith finding, and (2) as to the second factor, even though the parties were related through marriage, the evidence established that the settlement was

reached through arm's-length negotiations, making that factor "neutral." Thus, after the second order, two of the factors weighed against a good-faith finding, while two were neutral.

¶ 29    "Ultimately, however, whether a settlement satisfies the good-faith requirement as contemplated by the Contribution Act is a matter left to the discretion of the trial court based upon the court's consideration of the totality of the circumstances." *Johnson*, 203 Ill. 2d at 135. "This totality-of-the-circumstances approach allows trial courts to give effect to the strong public policy favoring the peaceful settling of claims, and at the same time allows trial courts to be on guard for any evidence of unfair dealing, collusion, or wrongful conduct by the settling parties." *Dubina v. Mesirow Realty Development, Inc.*, 197 Ill. 2d 185, 191 (2001). On appeal, we review a court's good-faith determination for an abuse of discretion. *Johnson*, 203 Ill. 2d at 135. "A trial court abuses its discretion where its ruling is so arbitrary or illogical that no reasonable person would adopt it." *Daniels v. ArvinMeritor, Inc.*, 2019 IL App (1st) 190170, ¶ 96.

¶ 30    In the case at bar, the trial court initially determined that defendants had shown that the settlement between plaintiff and Hartley was not a good-faith settlement, but ultimately reconsidered and made a good-faith finding after realizing that it had "overstated" Hartley's potential liability and "read too much into the relationship between the settling parties." Defendants contend that the trial court was correct in its initial determination, and erred in later making a good-faith finding. After considering the totality of the circumstances, we agree.

¶ 31    First, we cannot overlook the elephant in the room: the relationship between plaintiff and Hartley. In its original order, the trial court found that this factor weighed against a good-faith finding. The court found that the parties were related by marriage and that, even though plaintiff's marriage with Hartley's brother had been dissolved 15 years ago, takers in the

wrongful death action included plaintiff's former husband, another son, and a daughter. The court further found that plaintiff's former husband and remaining son both also worked for Hartley and were, in fact, present when decedent's death occurred. The court also noted that plaintiff and Hartley had "known each other for years." Accordingly, the court found that "[t]heir agreement to settle this wrongful death case for only $50,000 has the appearance of collusion." Later, in its order granting the motion to reconsider, the trial court found that it had "read too much into the relationship between the settling parties." The court found that it had "erred in inferring the appearance of collusion between the settling parties where there was no affirmative evidence of collusion in the record." The court noted that "[e]xtensive discovery was taken to probe communications between various members of the Hartley family." Nevertheless, the evidence in this case points to an arm's length settlement negotiated by counsel." The court concluded that "[t]here is no direct evidence that Tony Hartley or [plaintiff] were involved in negotiating the proposed settlement. The court drew an inference from a familial relationship; the inference was not drawn from testimonial or documentary evidence." However, we cannot say that the trial court was incorrect in its initial findings, in the exercise of its discretion, that the relationship between the parties weighed against a finding of good faith. The evidence showed that either decedent's father and brother (1) worked for Hartley, or (2) did work for Hartley as an independent contractor, or (3) worked on the same project as decedent where Hartley was a major contractor or subcontractor.

¶ 32    Hartley attempts to minimize any relationship, noting that the marriage between plaintiff and Hartley's brother had been dissolved 15 years earlier, and claiming that "[a] former familial relation[ship] does not automatically equate to a close relationship." While it is certainly true that a since-ended familial relationship may not be close—indeed, even blood

relatives may not have a close relationship—it is also true that all of the evidence establishes that, in this case, Hartley was still closely intertwined with plaintiff's family. Most obviously, decedent was working for Hartley—his uncle—at the time of his death, as was decedent's father, Hartley's brother (or working on the same project). Decedent's brother was also present at the worksite at the time of decedent's death (although Hartley represented below that the brother did not work for him). Additionally, while plaintiff herself may no longer legally be in Hartley's family, that is not the case with respect to decedent's other family members, namely, his father, brother, and sister, all of whom are Hartley's blood relatives and all of whom would be takers under the Wrongful Death Act. See 740 ILCS 180/2(a) (West 2018) (the damages recovered in a wrongful-death action are exclusively for the benefit of a decedent's surviving spouse and next of kin). In short, this is not a case of far-flung relatives with no connection other than their lineage. Instead, all of the evidence in the record shows that this is a case in which family members worked together in a business run by another family member, meaning that there is both a familial and economic connection between Hartley and plaintiff's family, in that the family members either worked for, with, or on the same projects as Hartley.

¶ 33    Additionally, plaintiff chose not to sue Hartley directly or bring a workers' compensation case under Tennessee law. Hartley was only made part of the case when he was named as a defendant in defendants' third-party complaints for contribution. In considering this factor below, the trial court found that while the complaint was based on strict liability due to the known dangers of methylene chloride, plaintiff nevertheless "chose not to sue her former brother-in-law for negligence even though Tony Hartley supplied an inferior respirator for [decedent's] use." The court found that this "also bears the appearance of collusion." While the trial court in its order granting the motion for reconsideration later found that decedent, not

15

Hartley, had purchased the respirator at issue, the court did not alter its conclusion that the failure to sue Hartley directly weighed against a good-faith finding.

¶ 34    At a March 21, 2019, hearing, plaintiff's counsel addressed the reasons for not suing Hartley directly:

> "We had our reasons for not wanting to sue Tony Hartley in the first place. Number one is because we still believe that after the Court analyzes it, [the court is] going to determine that he's our employer, so we wouldn't be able to sue him. But even if we were able to sue him under some independent contract[or] theory, we're not required to do that.
>
> My client has always viewed this as a straight products liability case against the manufacturers of the product that killed her son, and that's the bottom line."

It is true that plaintiff is not required to sue Hartley, or bring a workers' compensation case against him, but normally, one or the other would occur, and we must consider it as a factor.

¶ 35    Courts reviewing good-faith findings have found that a close personal connection between the settling parties is considered in making a finding that the settlement was made in good faith, especially where the plaintiff chose not to sue the settling tortfeasor directly or bring a workers' compensation case. For instance, in *Warsing v. Material Handling Services, Inc.*, 271 Ill. App. 3d 556, 558 (1995), *abrogated in part on other grounds by Johnson*, 203 Ill. 2d at 132,[4] the nonsettling party objected to a good-faith finding partly on the basis that the plaintiff's family and the family of the settling tortfeasor "were very close friends." In

---

[4] Our supreme court in *Johnson* found that the party challenging the good faith of a settlement must establish the absence of good faith by a preponderance of the evidence. *Johnson*, 203 Ill. 2d at 132. Prior to that time, appellate courts were split on the standard of proof, with most applying a "clear and convincing" standard, while others applied a "preponderance of the evidence" standard. *Johnson*, 203 Ill. 2d at 130-32.

considering whether the totality of the circumstances supported a good-faith finding, the appellate court found that the close personal relationship between the parties and the fact that no valid reason was proffered as to why the settling tortfeasor was not sued directly meant that "[t]he only reasonable inference to be drawn is that plaintiff did not do so because of the relationship between the parties." *Warsing*, 271 Ill. App. 3d at 560. Similarly, the appellate court in *Ross* considered the "strong affinity and close relationship" between the plaintiff and the settling tortfeasor to support a finding that the settlement was not made in good faith, where the plaintiff had developed a psychological dependence on the settling tortfeasor—his doctor—and had elected not to sue the doctor himself. *Ross*, 2019 IL App (1st) 181579, ¶ 35.

¶ 36    Hartley points to *Wasmund v. Metropolitan Sanitary District of Greater Chicago*, 135 Ill. App. 3d 926 (1985), *abrogated in part on other grounds by Johnson*, 203 Ill. 2d at 132, arguing that a personal relationship alone is not sufficient to show that a settlement was not made in good faith. In that case, the parties were "friends" at the time of the accident at issue, and later married, which the nonsettling tortfeasor claimed was evidence of collusion. *Wasmund*, 135 Ill. App. 3d at 930. The appellate court disagreed, finding that "[w]e do not believe that the fact that the two were friends is sufficient, without more, to taint the settlement with an indicia of collusion." *Wasmund*, 135 Ill. App. 3d at 930.

¶ 37    We agree with Hartley that the familial relationship is not a dispositive factor in itself. Indeed, our supreme court has cautioned that "[e]mphasis should not be placed on any single factor." *Johnson*, 203 Ill. 2d at 139. However, while this relationship is not dispositive, it certainly is a relevant factor to consider in determining whether the settlement was made in good faith, despite Hartley's contention to the contrary.

¶ 38　　　　Another factor that we look to in examining the settlement is the amount of the settlement, which "must be viewed in relation to the probability of recovery, the defenses raised, and the settling party's potential legal liability." *Johnson*, 203 Ill. 2d at 137. In the case at bar, plaintiff and Hartley settled for $50,000, which defendants contend is unreasonable given Hartley's level of responsibility and the presence of a $1 million insurance policy. In both of the trial court's orders, the court found that this factor weighed against a good-faith finding. In its original order, the court found that Hartley's fair share of liability was "potentially significant," especially given that TOSHA issued a report that was critical of the respirator that decedent was wearing and of Hartley for supplying it. The court found that the $50,000 settlement represented 5% of the available liability coverage under Hartley's insurance policy. The court noted that the policy contained an exclusion for employees, but found that "it is not clear that the exclusion would apply in this case," as records showed that decedent was paid as an independent contractor and received an IRS Form 1099 and no worker's compensation claim was filed. Thus, the court found that defendants "have shown that the settlement amount is not reasonable compared to Tony Hartley's fair share of liability." Later, in its order granting the motion to reconsider, the court found that it had made an error of fact when it found that Hartley had supplied the respirator decedent was using. The court found that "[t]he error of fact is critical, because it wrongly attributes fault to Tony Hartley. As a result, the court did not properly assess potential liability." However, the court found that this factor "still weighs in favor of [defendants], but the fact that [decedent] supplied his own respirator diminished Tony Hartley's potential liability."

¶ 39　　　　The record shows that TOSHA found that Hartley had committed 13 violations of safety regulations in connection with decedent's death, 12 of which were "serious" violations:

18

¶ 40     First, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.134(e)(1) in that "[t]he employer did not provide a medical evaluation to determine the employee's ability to use a respirator in the workplace before the employee was required to use the respirator."[5]

¶ 41     Second, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.134(f)(2) in that "[t]he employer did not ensure employees were fit tested prior to initial use of a respirator in the workplace."

¶ 42     Third, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(c)(1) in that "[t]he employer did not ensure an employee was not exposed to an airborne concentration of methylene chloride (MC) in excess of twenty-five parts per million (25 ppm) as an 8-hour TWA when using chemical stripper containing MC to refinish a bathtub."

¶ 43     Fourth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(d)(1)(i) in that "[t]he employer did not determine employee exposure to methylene chloride (MC) during use of a chemical stripper containing MC."

¶ 44     Fifth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(d)(2) in that "[t]he employer did not perform initial monitoring to determine employee exposure to methylene chloride (MC) during use of a chemical stripper containing MC."

¶ 45     Sixth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(f)(1) in that "[t]he employer did not institute effective engineering controls and work practices to reduce

---

[5] The violations use the term "employer" and "employee." Under 29 C.F.R. 1910.2, an "[e]mployer means a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State." 29 C.F.R. 1910.2(c). An "[e]mployee means an employee of an employer who is employed in a business of his employer which affects commerce." 29 C.F.R. 1910.2(d). The TOSHA report provided that "[i]t is unclear whether the [redacted] are subcontractors of the employer or employees; for the purpose of this report they are referenced as employees." However, as noted, Hartley did not challenge any of the TOSHA violations.

employee exposure to methylene chloride concentrations below the permissible exposure limits."

¶ 46    Seventh, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(g)(2)(i) in that "[t]he employer had not established and implemented a written respiratory protection program with worksite specific procedures when respirators were required to be work in the workplace." Such a program would include, at minimum, procedures for selecting respirators for use in the workplace; medical evaluations of employees required to use respirators; fit testing procedures for tight-fitting respirators; procedures for proper use of respirators in routine and reasonably foreseeable emergency situations; procedures and schedules for cleaning, disinfecting, storing, inspecting, repairing, discarding, and otherwise maintaining respirators; procedures to ensure adequate air quality, quantity, and flow of breathing air for atmosphere-supplying respirators; training of employees in the respiratory hazards to which they are potentially exposed during routine and emergency situations; training of employees in the proper use of respirators, including putting on and removing them, any limitations on their use, and their maintenance; and procedures for regularly evaluating the effectiveness of the program.

¶ 47    Eighth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(g)(3)(i) in that "[t]he employer permitted an employee to utilize a half-mask respirator when working with methylene chloride."

¶ 48    Ninth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(*l*)(1) in that "[t]he employer did not provide information and training on methylene chloride (MC) when the employee's job involved using MC."

¶ 49    Tenth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1052(*l*)(3)(ii) in that "[t]he employer did not provide employees exposed to airborne concentrations of methylene

chloride that exceeded or can reasonably be expected to exceed the action level with effective training."

¶ 50    Eleventh, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1200(e)(1) in that "[t]he employer had not developed, implemented, and maintained a written hazard communication program which at least described how criteria for labels and other forms of warning, safety data sheets, and employee information and training would be met." An adequate program would list the hazardous chemicals known to be present using an identity that is referenced on the safety data sheet; detail the methods the employer will use to inform employees of the hazards of non-routine tasks; contain the methods the employer will use to communicate information, with employees and other employers, concerning hazardous chemicals present on multi-employer worksites; detail hazardous chemical labeling requirements; detail provisions for a safety data sheet to exist in the workplace for each hazardous chemical which they use; and detail provisions for employee training.

¶ 51    Twelfth, Hartley was cited for a "serious" violation of 29 C.F.R. 1910.1200(h)(1) in that "[t]he employer did not train employees on hazardous chemicals in the work area."

¶ 52    Thirteenth, Hartley was cited for an "other-than-serious" violation of a Tennessee Department of Labor and Workforce Development rule in that "[t]he employer did not report a fatality of an employee within eight hours."

¶ 53    Hartley entered into an informal settlement agreement with TOSHA to address these violations, in which he did not contest any of the violations. Thus, Hartley's potential liability with respect to decedent's death may be considerable.

¶ 54    Hartley, however, contends that his liability is not clear, given that there is a question as to whether decedent was Hartley's employee or an independent contractor at the time of his death.

Hartley claims that the employee/independent contractor distinction affects both whether he would be liable in the underlying case, as well as whether his insurance policy would be applicable. According to him, if decedent was found to be an independent contractor, then Hartley would not be responsible for his death. Conversely, if decedent was found to be an employee, then Hartley's insurance policy would not apply due to an employee exception, meaning that Hartley would be unable to pay any judgment against him. There is not enough in the record of this case for us to make a determination of the accuracy of that contention, even if we were able to make that determination.

¶ 55    We first note that a hearing on a good-faith finding is not the time to determine the merits of the parties' underlying claims or to determine the parties' relative culpability. *Johnson*, 203 Ill. 2d at 139 ("a trial court need not decide the merits of the tort case or rule on the relative liabilities of the parties before making a good-faith determination"). Nevertheless, we also cannot close our eyes to the evidence presented below, which includes numerous documents suggesting that decedent was an independent contractor, including an IRS Form 1099 for his work for Hartley, as well as the fact that Hartley did not have a worker's compensation policy. If that is the case, then Hartley would certainly have a defense, as generally, one who employs an independent contractor is not liable for harm caused by the contractor's acts or omissions, unless they have certain controls over the contractor, as we discuss in more detail below. See *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 31. However, it is hard to believe that an unskilled worker, as the decedent appeared to be, would meet the requirements for an independent contractor.

¶ 56    Additionally, Hartley overstates the extent of that defense when he claims that "the law is entirely clear that [Hartley] would bear no liability for decedent's conduct." Contrary to

22

Hartley's contention, one who hires an independent contractor may still be liable for its own negligence when he retains some control over the independent contractor. *Carney*, 2016 IL 118984, ¶ 33. " 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.' " *Carney*, 2016 IL 118984, ¶ 33 (quoting Restatement (Second) of Torts § 414 (1965)). Thus, if Hartley retained control over the manner of decedent's work, he would be liable for his own negligence in failing to exercise that control with reasonable care. The record shows that Hartley received numerous citations for TOSHA violations based on his failure to ensure that decedent was using defendants' product safely. While Hartley correctly notes that the TOSHA violations alone do not establish a duty, such violations may be evidence of failure to exercise reasonable care where such a duty exists. *Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065, 1074 (2003); *Miller v. Archer-Daniels-Midland Co.*, 261 Ill. App. 3d 872, 879 (1994) ("Violations of Occupational Safety and Health Administration standards may constitute evidence of negligence but do not create a statutory duty."). Consequently, if the evidence showed that Hartley had a duty to exercise reasonable care for decedent's safety, the TOSHA violations would serve as evidence of a breach of that duty. As noted, we make no comment as to the strength of any defense that may ultimately be asserted, as that is not before us at this point in the litigation. Instead, we merely observe that Hartley's potential liability is extensive, but is subject to the determination of whether decedent was an employee or independent contractor.[6] We also observe, however, that uncertainty about

---

[6] We note that Hartley makes a number of arguments attacking the third-party complaints and raising defenses to them. However, in determining whether the settlement was made in good faith, we are concerned with *plaintiff's* potential causes of action against Hartley, and his defenses to *those*, not the

23

the strength of the case against Hartley was not one of the reasons raised by plaintiff's counsel below when he explained to the trial court why Hartley was not sued directly. Thus, there is nothing in the record to suggest that this was a factor in deciding to settle for only $50,000. See *Johnson*, 203 Ill. 2d at 137 (noting that, despite the nominal amount of the settlement, the plaintiff had represented that the settling tortfeasor was not sued directly because extensive research on the matter indicated such a lawsuit would have little likelihood of success).

¶ 57     With respect to Hartley's claims about his insurance policy, in addition to the evidence that decedent was an independent contractor, we also note that while, below, Hartley represented that his insurer was defending him under a reservation of rights, he has not provided any proof of this. Moreover, even if the insurer was contesting coverage, it does not necessarily follow that the insurer would have been successful. See *Warsing*, 271 Ill. App. 3d at 561 (finding unpersuasive the fact that, at the time of the settlement, it was not certain whether the insurance policy would apply). And again, plaintiff's counsel did not list uncertainty about the availability of insurance proceeds as a reason for not suing Hartley directly. Thus, we cannot find that any uncertainty about the applicability of Hartley's insurance policy explains the low settlement amount.

¶ 58     As noted, the determination of whether a settlement is made in good faith depends on the consideration of the totality of the circumstances. *Johnson*, 203 Ill. 2d at 135. "This totality-of-the-circumstances approach allows trial courts to give effect to the strong public policy favoring the peaceful settling of claims, and at the same time allows trial courts to be on guard for any evidence of unfair dealing, collusion, or wrongful conduct by the settling parties."

---

merits of the third-party complaints. Accordingly, we need not discuss his claims with respect to defendants and their complaints against him.

*Dubina*, 197 Ill. 2d at 191. In the case at bar, the totality of the circumstances reveal that the settlement between plaintiff and Hartley is not a good faith settlement that comports with the purposes of the Contribution Act. The settling parties share a close personal relationship, which included decedent working for his uncle at the time of his death. Hartley's potential liability for decedent's death is considerable, where he was found to have violated numerous safety regulations, which he did not challenge. Despite this potential liability, plaintiff chose not to sue Hartley directly and the settlement was for a modest amount—$50,000—even though Hartley maintained an insurance policy that provided $1 million per occurrence in coverage. There is no explanation for the low amount of the settlement, other than Hartley's representation that insurance coverage is not guaranteed. Hartley does have defenses to his liability, especially if decedent is found to have been an independent contractor, but plaintiff did not raise these defenses in explaining why she did not sue Hartley directly, so there is no suggestion that these defenses had any impact in determining the amount of the settlement. In sum, we must conclude that the trial court abused its discretion in finding the settlement to have been made in good faith, in light of the totality of the circumstances.

¶ 59    We recognize that plaintiff does not want Hartley to be part of this litigation, and that she would prefer to focus on the manufacturer and seller of the product that she alleges was responsible for her son's death. However, the Contribution Act seeks to promote two important public policies: the encouragement of settlements and the equitable apportionment of damages among tortfeasors. *Antonicelli*, 2018 IL 121843, ¶ 13; *Johnson*, 203 Ill. 2d at 133. Permitting plaintiff to settle with Hartley under the circumstances present here would not serve the latter purpose, as it would remove a party who potentially bears a great deal of responsibility for decedent's death, resulting in an apportionment of damages that is anything but equitable. This,

25

plaintiff is not entitled to do and, consequently, we must reverse the trial court's good-faith finding.

¶ 60    As a final matter, we note that defendants also claim that they were denied adequate discovery in order to properly respond to the issue of whether the settlement was made in good faith. Although we are reversing the trial court's good-faith finding, we address this issue, as it is likely to recur on remand. The trial court is in the best position to decide what type of hearing is necessary to fully adjudicate the issue of good faith, and an evidentiary hearing is not necessarily required. *Johnson*, 203 Ill. 2d at 136. Indeed, our supreme court has explained that the trial court may determine whether the settlement amount bears a reasonable relationship to the settling party's relative culpability in the absence of such a hearing. *Johnson*, 203 Ill. 2d at 136. However, as discussed above, one of the major issues affecting the trial court's good-faith determination was the question of the parties' relationship and its effect on the settlement. In fact, the trial court pointed to the fact that there was no "affirmative" evidence of collusion in granting the motion to reconsider. The only way to determine whether the parties' relationship affected the settlement is to allow defendants to depose plaintiff and Hartley, which they were not permitted to do in challenging the settlement. On remand, therefore, if the trial court is asked to consider any future settlement between plaintiff and Hartley, defendants should be permitted whatever relevant discovery they need in order to properly address the good faith of any proposed settlement.

¶ 61                                  CONCLUSION

¶ 62    For the reasons set forth above, we reverse the trial court's good-faith finding. The totality of the circumstances leading to the settlement show that the settlement was not entered into in good faith, where the parties had a close personal relationship, where Hartley had considerable

26

potential liability, and where the settlement amount was modest compared to the limits of the insurance policy. Additionally, if the trial court is presented with any future settlement between plaintiff and Hartley, defendants should be permitted whatever relevant discovery is necessary to properly address the issue.

¶ 63         Reversed and remanded with instructions.

**No. 1-19-2619, 1-19-2620 (cons.)**

| | |
|---|---|
| **Cite as:** | *Hartley v. North American Polymer Co.*, 2020 IL App (1st) 192619 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18 L 004262; the Hon. Melissa A. Dukin, Judge, presiding. |
| **Attorneys for Appellant:** | Michael D. Krause, Rachel D. Kiley, and Patrick W. Etchingham, of Bollinger Connolly Krause LLC, of Chicago, for appellant North American Polymer Company, Ltd. James P. McCarthy, Paul Van Lysebettens, and Paul B. O'Flaherty, Jr., of Gunty & McCarthy, of Chicago, for appellant Samax Enterprises, Inc. |
| **Attorneys for Appellee:** | Mathew K. Hargrave, of Best, Vanderlaan & Harrington, of Chicago, for appellee Tony Hartley d/b/a Hartley's Painting. Eric D. Jones, of Tarpey, Jones & Schroeder, LLC, of Chicago, for appellee Wendy Hartley. |